IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KYLE W. REUTER | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.:_____ |
| | § | |
| XTO ENERGY INC. AND | § | |
| EXXON MOBIL CORPORATION | § | |
| | § | JURY DEMANDED |
| *Defendants.* | § | |
| | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Kyle W. Reuter ("Mr. Reuter"), by and through his attorneys, TB Robinson Law Group, PLLC, and brings this action against XTO Energy Inc. ("Defendant XTO") and Exxon Mobil Corporation ("Defendant Exxon") (collectively, "Defendants"), pursuant to the Americans with Disabilities Act, 42 U.S.C., §12101, et. seq. ("ADA"), and for cause of action would show the following:

### I.   NATURE OF CLAIMS

1. This action is filed pursuant to the Americans with Disabilities Act, 42 U.S.C., §12101, et. seq. ("ADA"), to remedy acts of disability discrimination and retaliation.

2. Mr. Reuter seeks equitable relief, back and future pay, lost benefits, reinstatement, compensatory and punitive damages for violations of the ADA suffered by Mr. Reuter during his employment with Defendants.

## II. PARTIES

3. Plaintiff Kyle W. Reuter is an individual who resides in Houston, Harris County, Texas. Mr. Reuter is a former employee of Defendants XTO Energy Inc. and Exxon Mobil Corporation, which constitute a single, integrated enterprise.

4. Defendant XTO Energy Inc. is a wholly owned subsidiary of Defendant Exxon Mobil Corporation. Defendants are oil and gas corporations, which conduct business and have their principal places of business in the State of Texas. Defendants may be served with process by serving their registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service, at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## III. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Mr. Reuter is bringing this claim pursuant to the Americans with Disabilities Act, 42 U.S.C., §12101, et. seq.

6. Pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §1391(b)(2), venue is proper in the this district because a substantial part of the events or omissions giving rise to these causes of actions, including the unlawful employment practices, occurred in in Harris County, Texas, which is in this judicial district.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. On January 21, 2020, Mr. Reuter timely filed a charge of discrimination, EEOC Charge No. 460-2020-01891, against Defendant Exxon Mobil Corporation with the Houston Division of the U.S. Equal Employment Opportunity Commission ("EEOC").

8. On February 5, 2020, Mr. Reuter received a Notice of Right to Sue dated January 28, 2020 from the EEOC. Mr. Reuter files this complaint within 90 days after receiving a notice of the right to sue from the EEOC.

## V. SPOLIATION

9. Mr. Reuter hereby requests and demands that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom, including investigation reports, statements, photographs, videotapes, audiotapes, recordings, business records, financial records, bills, estimates, invoices, checks, measurements, equipment, correspondence, memoranda, files, facsimiles, email, voice mail, text messages, and any electronic image, digital data, or information related to the referenced incident and allegations herein.  Failure to maintain such items will constitute "spoliation" of the evidence.

## VI. FACTS

10. In 2010, Defendant Exxon acquired Defendant XTO making Defendant XTO, a wholly owned subsidiary of Defendant Exxon.

11. On January 23, 2012, Mr. Reuter began his employment with Defendant XTO as an Associate Landman. Prior to joining Defendant XTO, Mr. Reuter graduated from Texas Tech University with a Bachelor of Business Administration degree in Energy Commerce. While attending Texas Tech University, Mr. Reuter gained landman experience as a Field Landman Intern and Landman Intern with another energy company.

12. Unfortunately, in 2007, while Mr. Reuter was still attending college, he suffered a traumatic brain injury, leaving him completely deaf in his right ear. The complete deafness in Mr. Reuter's right ear is also known as Single Sided Deafness ("SSD"). It is extremely difficult for an adult to cope with SSD as the brain does not know how to adjust for the hearing loss.

13. When Mr. Reuter began with XTO in January 2012, he was located in the Fort Worth, Texas office, under the management of Alan Cody. Mr. Reuter was open with his colleagues and

manager about his hearing loss, especially as his office was in a noisy and talkative area of the office building.

14. Mr. Reuter wore noise-canceling headphones to block out office noise and chatter as his disability made him unable to identify the location of sounds and noisy environments could cause distortion in the hearing of his left ear, his good ear.

15. In 2015, while Alan Cody was Mr. Reuter's manager, he told Mr. Reuter that he did not like him (Reuter) wearing headphones. Mr. Reuter explained to Alan Cody that he wore headphones to manage his disability of being deaf in one ear, to which Alan Cody responded that he did not care, and that Mr. Reuter must stop wearing headphones. To placate Alan Cody, Mr. Reuter stopped wearing headphones, and instead shut his office door in order to block out noise so he could still cope with his disability.

16. After four years, Alan Cody ("VP Cody") was promoted to XTO Vice President-Land and Chris Broadway ("Manager Broadway") became Mr. Reuter's manager. Under Manager Broadway's supervision, Mr. Reuter immediately noticed that his coworkers regularly wore headphones and shut their office door, as needed. In fact, Manager Broadway shut his office door every day for long periods of time. Thus, Mr. Reuter resumed wearing headphones and continued to shut his office door to manage his disability as it was common for his colleagues located on two floors of the office building, who were not disabled, and who worked under the same managers, to regularly wear headphones and shut their office doors without repercussions.

17. Throughout his tenure as an Associate Landman, Mr. Reuter performed well and even performed duties of a Senior Landman position. Thus, Mr. Reuter was understandably blindsided when on October 21, 2016, Manager Broadway informed him that he (Reuter) was being placed on a Performance Improvement Plan ("PIP"). Manager Broadway first gave Mr. Reuter his

performance review, stating that Mr. Reuter "closed his door for long periods of time and has ears [sic] buds in[.]" The performance review additionally stated that Mr. Reuter "has been told this [was] unprofessional and these should not be used in the office." However, Manager Broadway never warned Mr. Reuter that his use of headphones/earbuds or shutting his office door was unprofessional. Additionally, in Mr. Reuter's performance review, Manager Broadway stated that he "believe[d] Kyle has good judgment at times, however staying in his office with his door shut does not give a good perception."

18. Had Manager Broadway raised these issues with Mr. Reuter earlier, he would have explained, as he did with VP Cody, that he wore headphones and shut his office door for medical purposes. In fact, when Manager Broadway read aloud the statements to Mr. Reuter him (Reuter) closing his office door and wearing headphones, Mr. Reuter immediately explained that he used the headphones to cope with his hearing disability. Mr. Reuter additionally requested that if he was not allowed to use headphones or close his office door, that he be moved to a much quieter office location around the corner. Manager Broadway immediately denied Mr. Reuter's request.

19. However, Mr. Reuter was not the only employee who wore headphones and shut his office door. Scores of his colleagues, who were not hearing-disabled, wore headphones daily and shut their office door, but they were not accused of being "unprofessional," nor given a negative performance review. However, Mr. Reuter was labeled "unprofessional," for using headphones and shutting his office door for a legitimate medical purpose, which resulted in him receiving a negative performance review.

20. Manager Broadway then informed Mr. Reuter that because of his performance review, he (Reuter) was being placed on a PIP. Manager Broadway additionally informed Mr. Reuter that VP Cody had previously told him (Reuter) that he did not like Mr. Reuter wearing headphones.

Manager Broadway then asked Mr. Reuter why he had started wearing headphones again. Even though Mr. Reuter had already explained that he used headphones to cope with his disability, Manager Broadway remained steadfast in his belief that Mr. Reuter was being defiant in continuing to wear headphones after being told not to by VP Cody. As it was clear that neither VP Cody nor Manager Broadway cared that he used headphones for medical purposes, Mr. Reuter then simply replied that while VP Cody was his manager, he stopped wearing headphones and instead closed his door, but as he (Broadway) was a different manager, he (Reuter) thought he could start wearing headphones again.

21.     The PIP stated that Mr. Reuter was not meeting the performance expectations of an Associate Landman, that he "must conduct himself in a positive professional manner at all times[,]" and "must refrain from using ear buds at the office and closing his door with the exception of conference calls." Manager Broadway then advised Mr. Reuter that XTO Human Resources Supervisor Amy Walkmeyer ("HR Supervisor Walkmeyer") would be coming in to speak with him about the PIP from a HR perspective.

22.     Mr. Reuter immediately told HR Supervisor Walkmeyer that management had written him up for wearing headphones and closing his office door, which he utilized to cope with his hearing disability. HR Supervisor Walkmeyer advised Mr. Reuter to speak with Exxon Nurse, Melinda Harrison ("Nurse Harrison") and if Nurse Harrison deemed he needed an accommodation, management would consider it. HR Supervisor Walkmeyer then reviewed the PIP and another document with Mr. Reuter. The additional document offered Mr. Reuter two options: (#1) to elect to be placed on a four-month PIP or (#2) resign with outplacement services in lieu of the PIP. The document stated that Mr. Reuter had "7 days to consider which option to select."

23.     That same day, Mr. Reuter spoke with Nurse Harrison, who was based out of Defendant

Exxon's Spring, Texas campus. Nurse Harrison expressed that she was appalled that Mr. Reuter was being written up for wearing headphones and closing his office door and noted that everyone, including herself, closes their door and uses headphones. Nurse Harrison additionally stated that any person who walked through XTO's/Exxon's Fort Worth offices or Spring campus would find hundreds, if not thousands of people, wearing headphones and shutting their doors occasionally. Nurse Harrison admitted she was confused as to why Mr. Reuter was being singled out regarding this issue. She then advised Mr. Reuter to visit his ear, nose, and throat doctor to obtain documentation of his existing disability so she could then request reasonable accommodations on his behalf.

24. Heeding Nurse Harrison's advice, Mr. Reuter made an appointment with his ear, nose, and throat doctor, Dr. Mark Palmer ("Dr. Palmer"), but Mr. Reuter was afraid that he would not have the documentation Nurse Harrison requested until after the seven-day period to elect whether to be subjected to the PIP or resign. Thus, on October 26, 2016, Mr. Reuter emailed HR Supervisor Walkmeyer requesting an extension to make his choice, so that Nurse Harrison had time to review the disability and accommodation documents she had requested. HR Supervisor Walkmeyer replied that she still needed his decision within the timeframe, but if accommodations were necessary, management could consider them once Nurse Harrison had presented the accommodation requests to them.

25. Though Mr. Reuter disagreed with the statements contained in the PIP, as the seven-day (October 28, 2016) deadline was upon him and he still awaited his disability documentation from Dr. Palmer, Mr. Reuter decided to choose option #1 and elected to be placed on a four-month PIP.

26. Later, HR Supervisor Walkmeyer informed Mr. Reuter that she had spoken with VP Cody about removing the headphones statements from Mr. Reuter's performance review and PIP, which

he consented to. Mr. Reuter informed HR Supervisor Walkmeyer that he asked Manager Broadway why he had not spoken to him (Reuter) sooner about not wearing headphones, and Manager Broadway responded he wanted to see how long Mr. Reuter would keeping wearing them. HR Supervisor Walkmeyer admitted that was a "strange" response. Mr. Reuter advised HR Supervisor Walkmeyer that it appears he was being discriminated against.

27. Because Dr. Palmer's office was appropriately concerned about complying with HIPAA, it took Dr. Palmer longer to provide Nurse Harrison with her requested documentation. In a letter dated November 2, 2016, Dr. Palmer stated that Mr. Reuter "has a disability due to sudden loss hearing in his right ear ten years ago," which means he has "difficulty due to inability to identify sound location and distortion in loud environments." Dr. Palmer additionally stated that "if there is more than 50dB of sound there may be transmission of sound across the skull into the good ear creating distortion[,]" thus, "some patients find benefit in reducing environmental sound with ear protection or even eliminating excess sound by closing an office door."

28. On November 3, 2016, Nurse Harrison, on behalf of Mr. Reuter, submitted an accommodation request to Manager Broadway and HR Supervisor Walkmeyer, through a "Recommendation on Work Limitations" form, which stated that Mr. Reuter "would benefit from being able to close his office door, when needed to help control environmental noise that is distracting" and that he "be allowed to use earplugs/buds."

29. Mr. Reuter then requested the revised performance review and revised PIP that eliminated references to his use of headphones and shutting his office door, as they related to his disability, which Supervisor Walkmeyer later provided. Though the revised documents eliminated references to Mr. Reuter's earbuds and shutting his office door, they still stated he must conduct himself in a professional manner, despite the fact that all professionalism concerns clearly stemmed solely from

his use of earbuds/shut office door, which each represented reasonable accommodations under the ADA. Nevertheless, Mr. Reuter signed the revised PIP and was assured that the original (unrevised) PIP would not be placed in his personnel file.

30. Though the revised performance review and revised PIP did eliminate references to his use of earbuds/shutting his door, Mr. Reuter was still concerned about his managers' misconceptions surrounding his disability and his use of headphones/closed office door as reasonable accommodations. Mr. Reuter consulted with Nurse Harrison about sending an email to VP Cody, Manager Broadway, and HR Supervisor Walkmeyer that explained his disability and how his accommodations helped him cope with it. Nurse Harrison advised Mr. Reuter that the email would be a great idea as she could only divulge very limited information to them regarding his disability. Thus, Mr. Reuter emailed VP Cody, Manager Broadway, HR Supervisor Walkmeyer, and Nurse Harrison in order to address the comments contained in his original performance review and PIP that he was "unprofessional" for using headphones and closing his office door. Mr. Reuter stated that he had submitted documentation of his "hearing disability (complete deafness in [his] right ear)" and attached the letter from Dr. Palmer which provided the precise medical explanation. Mr. Reuter also stated that though VP Cody and Manager Broadway viewed his use of headphones and closed office door as "unprofessional behavior," he was only trying to minimize environmental noises in the office to benefit his performance. He asked that they consider what he is dealing with and allow him latitude in buffering the surrounding noise in the office.

31. On March 7, 2017, Mr. Reuter had successfully completed the requirements of his PIP and Manager Broadway presented a "Completion of Performance Improvement Plan" document to him. Though, normally, Mr. Reuter would have been promoted to a Landman position within two

to three years, under VP Cody's management, Mr. Reuter was denied any promotions, which continued under Manager Broadway's supervision because of their misconceptions of Mr. Reuter's "professionalism" as it related to his disability. Though Mr. Reuter successfully completed his PIP, the PIP would have a lasting effect in impeding Mr. Reuter from receiving a promotion or raise no matter who managed him.

32. On June 16, 2017, Defendant XTO announced that the company would be relocating to the Defendant Exxon's Spring, Texas Campus and that any employee who wanted to remain with XTO would need to move in June 2018. Mr. Reuter decided to make the move from Fort Worth to Houston to remain with Defendant XTO. As Manager Broadway decided not to move with Defendant XTO to Defendant Exxon's Spring, Texas Campus, Kelly Shoulders ("Manager Shoulders") became Mr. Reuter's manager.

33. Mr. Reuter's work environment at Defendants XTO/Exxon's Spring, Texas campus was drastically different from his Fort Worth office. Instead of having an office, Mr. Reuter was now in an open office environment comprised of cubicles. As sound traveled across the office easily, it was very noisy all day, requiring Mr. Reuter to wear headphones all day. Mr. Reuter was not alone as he noticed that a vast majority of his coworkers in the open cubicle environment wore headphones during the day, and even Manager Shoulders, who had an office, wore headphones.

34. Throughout Mr. Reuter's tenure under Manager Shoulders's supervision, Manager Shoulders repeatedly expressed how impressed she was with Mr. Reuter's performance and his mentorship of new landmen. She expressed to Mr. Reuter that she was frustrated that she could not promote him nor give him a raise because of his 2016 PIP. Manager Shoulders told Mr. Reuter that she could see he was doing a great job and he had every right to be frustrated and upset by his situation.

35. On March 21, 2019, Manager Shoulders informed Mr. Reuter that he was being removed from his role and being placed on a special project with an unknown timeframe, but she expected it would take six months or more. Mr. Reuter expressed his concern that being removed from his position and placed on a project made his work situation and career trajectory much more confusing. Mr. Reuter also asked Manager Shoulders why she would want to remove him from his position after she had repeatedly praised his performance. Manager Shoulders had no real explanation.

36. As Manager Shoulders conducted meetings, individually, with her employees every other week ("1:1 meeting"), and Mr. Reuter had his 1:1 meeting with Manager Shoulders the next day, he decided he would use this meeting to discuss his new project role and career trajectory. During the 1:1 meeting, Mr. Reuter inquired about his career trajectory, but Manager Shoulders had no concrete answers for him. Manager Shoulders eventually informed Mr. Reuter that over her seven years of employment with XTO, she had taken on roles she did not want, but she eventually rose through the ranks. Mr. Reuter told Manager Shoulders he understood, and he would use her experience to fuel him in his role, as she had taken less favorable roles to become a manager. Manager Shoulders advised Mr. Reuter that he needed the "special project" to get his career off the ground and out of the hole he was in. At no time during the meeting, did Manager Shoulders or Mr. Reuter yell at each other. Quite the opposite, it was a genial, positive conversation that helped Mr. Reuter gain a new perspective on his "special project" role.

37. However, later that afternoon, VP Cody asked Mr. Reuter to go to his (Cody's) office. When Mr. Reuter arrived at VP Cody's office, XTO HR Manager Erik VanDuivendyk ("HR Manager VanDuivendyk") was present. HR Manager VanDuivendyk told Mr. Reuter that he has heard that Mr. Reuter had "some pretty vocal and heated conversations" with Manager Shoulders

in the last 24 hours. HR Manager VanDuivendyk told Mr. Reuter that he was not there to rehash their conversation, but to tell him that they were "concerned about [his] behavior in those conversations, the animation, the yelling, they are not what [they] want in the workplace."

38. HR Manager VanDuivendyk then informed Mr. Reuter that they were sending him home and that he (Reuter) would be off until they figured out how they wanted to proceed. Mr. Reuter asked what HR Manager VanDuivendyk meant by "heated discussion," to which he responded that Mr. Reuter had a raised, angry voice. The fact is that Mr. Reuter had not raised his voice to Manager Shoulders. HR Manager VanDuivendyk then added that that this was not the first time Mr. Reuter has had this issue as he looked at Mr. Reuter's old performance improvement plans (plural) and "professional appropriate behavior was on there."

39. Later, Mr. Reuter spoke to HR Manager VanDuivendyk, privately, without VP Cody present. Mr. Reuter expressed his concern that the conversation had been very one-sided. HR Manager VanDuivendyk told Mr. Reuter that he had pulled up Mr. Reuter's two performance improvement plans, and "professional behavior" is on them, so that they were probably "going to be close to the point of saying, 'hey, we are done, you are probably best off looking elsewhere." As the revised PIP should have eliminated any professionalism concerns as they were solely based on Mr. Reuter's use of earbuds/shut office door (reasonable accommodations), Defendant XTO had improperly used Mr. Reuter's disability in deciding to send him home and ultimately terminate him.

40. Moreover, because HR Manager VanDuivendyk referenced two PIPs, the only other PIP he could mean was the original PIP as Mr. Reuter had never been placed on another. Mr. Reuter was assured that the original PIP would not be placed in his personnel file as it referenced his use of earbuds/shut office door, which were determined to be reasonable accommodations.

Nevertheless, the original PIP was placed in his personnel file, meaning that the Defendants further improperly based his decision to send Mr. Reuter home and ultimately terminate him based upon his (Reuter's) disability.

41. Mr. Reuter went home as instructed. Less than a week later, on March 27, 2019, Exxon HR representative, Sabrina Powell ("HR Rep. Powell") sent Mr. Reuter a text message asking if he had time for a conference call, to which Mr. Reuter responded that he did. HR Rep. Powell called Mr. Reuter and stated she had VP Cody on the line. VP Cody, who seemed to be reading from a document, informed Mr. Reuter that Defendant XTO was terminating his employment. VP Cody then stated HR Rep. Powell would be taking over. HR Rep. Powell explained the COBRA process to Mr. Reuter and asked if he had any questions. Mr. Reuter stated he could explain the situation to her and how he hears the world differently from her and everyone else because of a hearing disability which is documented in his medical file. HR Rep. Powell informed Mr. Reuter that they could not access his medical file and that the termination decision had been made.

42. Later VP Cody sent Mr. Reuter the termination letter which he had read, verbatim, to Mr. Reuter over the phone. Mr. Reuter was shocked that he had been terminated for allegedly displaying unprofessional behavior as an XTO Landman and an XTO Geologist had routinely displayed unprofessional behavior by yelling, cursing, slamming objects and doors, and even yelling at their managers without ever receiving a reprimand, much less termination.

## VII.     AMERICANS WITH DISABILITIES ACT

43. Mr. Reuter reasserts and incorporates by reference all the above-numbered paragraphs as if fully set forth herein.

44. Mr. Reuter has a disability, deafness is one ear, within the meaning of the ADA. Mr. Reuter is nevertheless qualified to perform the essential functions of his job as an Associate Landman,

with or without reasonable accommodation, and has suffered an adverse employment action, termination, because of his disability.

45. Mr. Reuter is an employee within the meaning of the ADA.

46. Defendant XTO and Defendant Exxon are employers within the meaning of the ADA as they are engaged in an industry affecting commerce, specifically the oil and gas industry, and have 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

47. Defendant XTO and Defendant Exxon are sufficiently related to constitute a single, integrated enterprise. Defendant XTO is a subsidiary of Defendant Exxon. At the time of Mr. Reuter's termination, Defendant XTO and Defendant Exxon had interrelated operations. Though Mr. Reuter was hired by Defendant XTO and his supervisors were also employed by Defendant XTO, Defendant Exxon conducted payroll and issued paychecks to Mr. Reuter, and is also identified as Mr. Reuter's employer on W-2 forms issued to him. Defendant XTO and Defendant Exxon both utilized the Spring, Texas campus as an office site. Moreover, Mr. Reuter was subject to both Defendant XTO's and Defendant Exxon's policies during his employment and even after his termination.

48. Regarding labor relations, Defendant XTO's and Defendant Exxon's human resources personnel both took employment actions against Mr. Reuter. XTO VP Cody and XTO HR Manager VanDuivendyk initially sent Mr. Reuter home after his conversation with Manager Shoulders. Later, XTO VP Cody and Exxon HR Rep. Powell notified Mr. Reuter that his employment had been terminated.

### A. First Cause of Action: Disability Discrimination under the ADA

49. Mr. Reuter reasserts and incorporates by reference all of the above numbered paragraphs as if fully set forth herein.

50. The Americans with Disabilities Act prohibits discrimination against any qualified individual on the basis of their disability. *See* 42 U.S.C. § 12112.

51. Defendants violated the ADA by intentionally discriminating against Mr. Reuter on the basis of his disability. Defendants' discriminatory acts include its termination of Mr. Retuer's employment. Defendants treated similarly situated, non-disabled employees more favorably than Mr. Reuter.

### B. Second Cause of Action: Retaliation under the ADA

52. Mr. Reuter reasserts and incorporates by reference all of the above numbered paragraphs as if fully set forth herein.

53. The Americans with Disabilities Act prohibits discrimination (retaliation) against any individual because such individual has opposed any act made unlawful by the ADA or has requested accommodations under the ADA. *See* 42 U.S.C. § 12203; *see also Vincent v. College of the Mainland*, 703 F. App'x 233, 239 (5th Cir. 2017).

54. Mr. Reuter engaged in protected activity by requesting reasonable accommodations under the ADA and complaining of disability discrimination to his employer. Defendants unlawfully retaliated against Mr. Reuter by terminating his employment.

## VIII. DAMAGES

55. Mr. Reuter sustained damages as a result of the actions and/or omissions of Defendants as described herein. Accordingly, Mr. Reuter is entitled to an award of actual and compensatory damages, including lost wages and benefits in the past and future, in an amount within the

jurisdictional limits of the Court. Mr. Reuter also seeks an award of damages for the mental anguish and pain and suffering he has suffered, continues to suffer, and will suffer in the future.

56.  Additionally, as a result of Defendants' above-referenced actions and/or omissions, Mr. Reuter was required to retain counsel to protect and enforce his legal rights. Accordingly, Mr. Reuter also seeks compensation for his attorneys' fees, as well as out-of-pocket expenses, expert fees, and costs of Court he will have incurred in this action.

### IX.   PUNITIVE DAMAGES

57.  Mr. Reuter would further show that the acts and/or omissions of Defendants complained of herein were committed with malice or reckless indifference to his protected rights. In order to punish said Defendants for engaging in unlawful employment actions and to deter such actions and/or omission in the future, Mr. Reuter also seeks recovery from Defendants for punitive damages.

### X.   JURY DEMAND

58.  Mr. Reuter demands a jury on all issues to be tried in this matter. Mr. Reuter has submitted the jury demand and herein submit the jury fee.

### XI.   PRAYER FOR RELIEF

59.  For the reasons set forth above, Mr. Reuter respectfully prays that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for him against Defendants for:

   a. All damages to which Mr. Reuter may be entitled to pursuant to this Original Complaint, or an amendment thereto, including but not limited to back pay, reinstatement, upgrading, and compensation for benefits not received;

   b. Lost wages in the future;

   c. Past physical pain and mental suffering;

d. Future physical pain and mental suffering;

e. Punitive damages in the amount above the minimum jurisdictional limits of the Court;

f. Reasonable attorneys' fees as allowed by law, with conditional awards in the event of appeal;

g. Prejudgment interest at the highest rate permitted by law;

h. Post-judgment interest from the judgment until paid at the higher rate permitted by law;

i. Costs of Court; and

j. Such other and further relief, at law or in equity, to which Mr. Reuter may be entitled, whether by this Original Complaint or by proper amendment thereto.

Respectfully Submitted,

TB Robinson Law Group, PLLC

*[signature]*

Terrence B. Robinson
Fed. Bar No. 14218
Texas Bar No. 17112900
Email: TRobinson@TBRobinsonlaw.com
Monica Nunez-Garza
Fed. Bar No. 2383144
Texas Bar No.: 24079068
Email: MNunez@TBRobinsonlaw.com
7500 San Felipe St., Suite 800
Houston, Texas 77063
Phone: (713) 568-1723
Facsimile: (713) 965-4288
**ATTORNEYS FOR PLAINTIFF,
KYLE W. REUTER**